Nicholas C. RICUCCI
v.
The UNITED STATES.
No. 209-67.

United States Court of Claims.
May 15, 1970.

John I. Heise, Jr., Washington, D. C., attorney of record for plaintiff; Leonard J. Meiselman, Mineola, N. Y., of counsel.

Judith A. Yannello, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before us on cross motions for summary judgment. The plaintiff, a non-veteran career employee, sues for back pay lost as a result of his removal by adverse action from the post of Revenue Agent, GS-11, in the Inter-

nal Revenue Service. He has exhausted his administrative remedies. In this court he tells us that the removal was legally invalid for a number of asserted errors of procedure and in the receipt of evidence. We hold that he is clearly right on the failure to accord him the opportunity of a proper "oral reply" and that he must prevail on that issue. Thus it becomes needless to rule on the other issues and we do not do so.

The sustained charges involved improper business relations with a taxpayer whose returns plaintiff audited, and false representations on a matter of official interest. His procedural rights contemplated a removal already in effect before he could have a hearing, with an appeal on which he had the burden of going forward with evidence. Since he was thus put at a disadvantage on the hearing date, attention focuses on the procedures that were required for his protection before removal. These included notice of charges and the right to make written and oral reply. He elected both. His superior, the District Director, appointed John P. Gildea to hear the oral reply, review it and the record, and recommend a final decision. Mr. Gildea is a Special Agent, a member of the IRS Intelligence Division. That Division we understand investigates taxpayer frauds and is organizationally separate both from plaintiff's part of the Agency and from the Inspection Service which investigates employee misconduct.

Plaintiff appeared with counsel before Mr. Gildea and made a statement, counsel however protesting that the oral reply opportunity was inadequate, mainly because he was not informed as to the evidence against his client. He was, he said later, up against a "wall of silence." Mr. Gildea interjected only an occasional question. These appeared meant to clarify plaintiff's allegations. He made no disclosure of the case against plaintiff, nor did he make any comment on its strength or weakness. He did not cut plaintiff off or prevent him or his counsel from saying what they wished to say. At the close he said:

Mr. Ricucci's reply and all materials submitted here today will be carefully considered and a decision will be rendered by the District Director.

The whole proceeding was taped, and afterwards transcribed. There can be no doubt it was considered, for in subsequent hearings it was referred to as evidence against Mr. Ricucci. There is nothing in the record to show that Mr. Gildea ever made any recommendation in the premises. It will have been noted that he did not state he would do so at the close of the "oral reply," only that an anonymous someone would consider the "oral reply" and the District Director would decide.

■ Both parties cite as the law on oral replies the Civil Service Commission Regulation, 5 C.F.R. § 752.202(b), which reads as follows:

\* \* \* \* \* \*

\* \* \* The employee is entitled to answer personally, or in writing, or both personally and in writing. The right to answer personally includes the right to answer orally in person by being given a reasonable opportunity to make any representations which the employee believes might sway the final decision on his case, but does not include the right to a trial or formal hearing with examination of witnesses. When the employee requests an opportunity to answer personally, the agency shall make a representative or representatives available to hear his answer. The representative or representatives designated to hear the answer shall be persons who have authority either to make a final decision on the proposed adverse action or to recommend what final decision should be made.

Both cite from Part 752–7 of the Federal Personnel Manual as follows:

2–5. Employee's Answer

\* \* \* \* \* \*

b. Oral Reply. (1) *Designation of person to hear oral reply.* If the employee requests an opportunity to make an oral reply, he is entitled to

**1254**

be heard by an agency representative or representatives who are superior to him and have the authority either to take or to recommend final action. This recommending authority need not be exclusive (*i. e.*, other officials may be requested to recommend the action they consider appropriate under all the circumstances), nor is it mandatory that the recommendation of the superior who receives the oral reply be the final recommendation submitted to the person or persons having authority to make the final decision on the proposed adverse action.

This material tracks the Veterans' Preference Act of 1944, Sec. 14, 5 U.S.C. § 863, now recodified as 5 U.S.C. § 7512 (Supp. IV, 1965–68), and made applicable to non-veterans by Executive Order 10988 of January 17, 1962. The requirement that the "agency representative" be "superior" to the accused employee is found only in the Manual, which may or may not have status as a regulation, but supposing it is binding on defendant, we do not deem it significant *per se* that Mr. Gildea was not above Mr. Ricucci as a supervisor in the same organizational unit. In common speech, a "superior" is one "of higher degree or rank", Webster's Third International Dictionary (1968), which Mr. Gildea was if his GS rating was above Mr. Ricucci's, as we presume it must have been.

■ Plaintiff's objections to Mr. Gildea's designation also fail, so far as grounded on our holding in Paterson v. United States, 319 F.2d 882, 884, 162 Ct.Cl. 675, 679 (1963), that the right to answer charges orally is not met by appearance before the investigators who have developed facts to substantiate the charges. As we have said, Mr. Gildea's Intelligence Division has no such duties, and it was the Inspection Service that made the case against plaintiff here.

■ Nevertheless, the fact remains that failure to award a proper opportunity for oral reply to an employee entitled to this right and requesting it, is a fatal defect in an adverse action. *Paterson, supra*; Tierney v. United States, 168 Ct.Cl. 77 (1964); Washington v. United States, 147 F.Supp. 284, 137 Ct. Cl. 344 (1957); see O'Brien v. United States, 284 F.2d 692, 694, 151 Ct.Cl. 392, 396 (1960). It remains to inquire whether the oral reply as provided for here was the kind the statute, the regulation, and the cases contemplate. This affords a very pretty problem in the interpretation of official language, but we think our answer is free from doubt. It is as true of the regulation as we said in *Washington*, 147 F.Supp. at p. 288, 137 Ct.Cl. at p. 350 of the statute, that the allowance of this oral reply implies an intent that the employee may succeed with it at times. It is not to be a futile ritual.

In the first place, there must be a significant difference in use and function between an oral reply and a written reply, since both are contemplated in the law. That difference would not exist in case of an oral reply dictated into a tape recorder, however satisfactory it might be to the employee to hear his own voice. The "oral reply officer" clearly therefore must play a role other than as presiding over a recording and transcribing medium. What the difference is—and the purpose of an oral reply—the oral arguments before this court would suggest. The person arguing orally can tell by our questions and comments how his presentation is going, what is making an impression and what is not, what needs clarification or substantiation, and what had best simply be dropped. To appoint an investigator—even one who normally investigates another kind of case—is to negate that feedback, as Mr. Gildea demonstrated here. Such a man is trained to let his witnesses divulge their secrets, while himself betraying no emotion, and disclosing no information. This is not to say that counsel was right in demanding access to the evidence. That is usurping the function of the later hearing. We do think he was entitled to a

general give and take discussion of the case, which the appointment of an investigator as "oral reply officer" seems as if expressly designed to negate.

Next, the regulation and manual require that the designated "oral reply officer" be one with authority to recommend what the final decision should be. This would normally include, we think, those who would so recommend in the regular course of their duties, whether of a line or staff nature. In the former category would be those who directed the section or unit to which the accused employee belonged. They would be in the best position to advise whether his dismissal would further the efficiency of the service. In the latter group would be staff aides such as the personnel officer, who could advise whether the proposed dismissal would be in accord with agency personnel policy and the regulations and precedents of the Civil Service Commission. Presumably advisers would advise according to their functions and expertise in the organization: thus the legal officer might advise on the legal aspects of any problem and the budget officer on the fiscal aspects, not vice versa. We do not deny that there might be occasions when for the employee's protection a District Director would legitimately desire the advice of a qualified person on a removal matter quite outside that person's normal duties, and if so, designating him as "oral reply officer" might be reasonable too. For example, he might suspect the employee was a victim of internal feuds or be in the bad graces of a clique. He might have race problems, or think he did. However, advice about a proposed dismissal from a person not having special expertise and not directly concerned with the action would be the reverse of helpful and if taken seriously would complicate the task, not facilitate it. As our decisions well demonstrate, this is a topic on which not everyone can be an instant expert. Suppose, for example, one of the charladies were selected as "oral reply officer" the derisory intent would be manifest. We assume that a career, even investigating tax frauds, does not make one an expert in the arcane mysteries of Government personnel.

The Manual provisions that the recommendation by the "oral reply officer" need not be the only one received and need not be the "final recommendation submitted" are pregnant with the expectation that such recommendations shall be otherwise at least as weighty with the deciding officer as those he receives from any of his regular advisers in such matters. The reference to the "final recommendation submitted" we suppose alludes to the fact that in the Executive Branch, a proposed decision, after drafting by a subordinate, is commonly circulated for initialing to officials concerned, normally in inverse order of their rank. The point is, anyway, that a recommendation by a person having neither expertise nor official concern with the problem involved cannot properly have weight with the deciding officer.

Finally, the record affords no explanation why Mr. Gildea was selected as "oral reply officer." Counsel stated in oral argument before us that the District Director had no special preference for investigators, but had decided to rotate the unpleasant assignment among the activities under his command. This appears to mean that neither expertise nor official concern with the problem have any weight in that District in the choice of an "oral reply officer."

[redacted] Taking the Regulation and Manual together, in summary, we read them as written for the protection of employees, and meaning that after adequate notice of charges and before dismissal, the accused employee may have an opportunity to discuss his case with an official of his agency. Not only may he state anything he pleases, from the number of mouths he has to feed to the alleged bias of his immediate supervisor, but he may expect help in presenting his case in form of such comments from the other side as would be natural from a person knowledgeable about the case and expecting largely to influence its resolu-

tion. Courts could hardly measure out the exact amount of loquacity he could demand, but at least they can discourage choice of an agency representative professionally trained to disclose nothing. Further, he has a right to expect that the "oral reply officer" will be one whose recommendation would be meaningful, not an empty formality. This would be normally assured if he was one of the deciding officer's circle of staff and line aides and advisers whom he regularly consults in such matters, unless the deciding officer has gone outside that circle for help for the employee's own better protection. In that case the record would show how the outsider's expertise was relied on.

There is nothing in the instant record to show that the choice of an outsider was meant for plaintiff's protection. The apparent motive, none other appearing, would have appeared to be to prevent him from learning anything he could use in his case, and it was to refute this that defendant's counsel offered the rotation explanation, which meets the standards of the Regulation and Manual hardly better.

■ We hold that the selection of a tax fraud investigator to hear the plaintiff's "oral reply" was an abuse of discretion when no better reason is adduced for it than here and where substantially all the investigator did was to take down by tape recorder the plaintiff's statements with some clarification, that it was an arbitrary and capricious exercise of delegated power, and that the legality of plaintiff's dismissal is infected accordingly. Defendant's motion for summary judgment is denied. Plaintiff's motion is allowed. Plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Rule 131.

SKELTON, Judge, concurring:

I concur with the reasoning and the result reached by the court in this case. However, there are a number of other issues in the case that I feel should have been discussed because of their importance. Accordingly, I would add the following:

### I

#### The Discharge of the Plaintiff Without a Hearing Denied Him Due Process

The agency followed the usual practice of government departments by serving notice of charges on the plaintiff, allowing him to make on oral reply, and then summarily discharging him from his job without a hearing (notwithstanding his 24 years of government service). The government says this procedure was authorized by the regulations. This may be true, but in my opinion to deny an employee of the government who has civil service rights his job without a hearing, in the absence of a national emergency or government security problem, is to deny him his constitutional rights of due process. I can see no meaningful difference between this situation and that which existed in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (U.S. Mar. 23, 1970). There the state officials of New York were attempting to cut off welfare payments to plaintiffs without a hearing. There was no requirement for a preliminary hearing just as there is none in the case before us.[1] The Supreme Court said in an opinion by Mr. Justice Brennan:

> * * * But we agree with the District Court that when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. Cf. Sniadach v. Family Finance Corporation, 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969). * * * [at 264, 90 S.Ct. at 1018.]

While the Court in that case did indicate there might be a difference between a welfare recipient whose aid has been cut off without a hearing and a discharged government employee who has been fired without a hearing, it was

1. The regulations were later changed to require a hearing before cutting off welfare payments.

speaking from an economic standpoint rather than a legal one. The Court said:

> * * * For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. * * * [T]ermination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy, [at 264, 90 S.Ct. at 1018.]

All of the foregoing could be, and probably should be, applied to most discharged government employees. Few of them earn more than enough to pay their living expenses from month to month, and when their salaries are cut off they may be in the same destitute circumstances as a welfare recipient whose aid has been discontinued. In any event, if there is any difference, it is only a matter of degree.

Consequently, I think that when the plaintiff was discharged without a hearing in our case, his property (his job) was taken from him without due process of law, notwithstanding any regulation or lack of one to the contrary.[2] A hearing for an employee who has already been discharged could hardly be a meaningful one because it is a proceeding after the fact.

## II

### The Burden of Proof was Erroneously Placed on the Plaintiff

At the hearing in this case (if we can dignify it by calling it a hearing), the examiner required the plaintiff to put on his evidence first. The defendnt says this was authorized by the regulations. This is not too clear, as the Internal Revenue Manual, Section 19(14)3.63(1) of December 31, 1964, merely refers to what is known as the Treasury Department Guide For Suggested Procedures on Conducting Hearings on Employee Appeals. This latter document states the employee will present his evidence first. I do not believe the Treasury Department Guide had the status of a regulation. Furthermore, its contents were merely suggestions and advice to the examiner.

In any event, at the time plaintiff was required to put on his evidence, no evidence had been offered against him. There was nothing at the hearing for him to rebut or overcome. The defendant has the burden of proof on the whole case to show that plaintiff should be discharged for the good of the service. If no evidence had been offered by either party, the decision would necessarily have been rendered for the plaintiff because the defendant would have failed to prove its charges against him. This is the test as to who has the burden of proof. *See* Selma, Rome & Dalton RR v. United States, 139 U.S. 560, 11 S.Ct. 638, 35 L.Ed. 266 (1891); Fleming v. Harrison, 162 F.2d 789 (8th Cir. 1947). To require the plaintiff to introduce his evidence first is like requiring an accused in a criminal trial to prove his innocence. In my opinion, this was an unauthorized shifting of the burden of proof and amounted to a denial of due process.[3]

## III

### The Plaintiff was Denied the Right of Cross-Examination

The error of the greatest magnitude in the whole case that is complained of

---

2. *See* Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

3. I am informed that this rule has now been changed by this agency and the government is now required to introduce its evidence first. I do not know what the rules of other agencies provide in this regard, nor what their practices may be.

by the plaintiff was the denial to the plaintiff of the right of cross-examination by the examiner. At the so-called hearing held after plaintiff had been discharged, the plaintiff was required to put on his evidence first, as discussed above, and then the government laid a file or folder containing various papers on the table and said "this is our case." It did not prove up the papers in the folder in any way and did not call a single witness to testify about anything. The plaintiff demanded the right to cross-examine the witnesses of the government whose statements were alleged to be in the folder, but the defendant refused to produce them. Plaintiff's counsel complained that he could not cross-examine the folder and that the government had not proved a case against the plaintiff. The government answered that it had proved its case when it discharged the plaintiff. Of course, such discharge occurred without a hearing, as mentioned above. If this reasoning and philosophy of the agency were followed, the plaintiff would not be entitled to a hearing at all. The folder which the defendant relied on contained the rankest kind of uncorroborated hearsay. It even contained a document that was derogatory of plaintiff that related to a previous investigation of plaintiff that had been closed five years earlier and which had nothing to do with the present charges. All of it was admitted into evidence and considered by the examiner in rendering his decision against the plaintiff. Any fair minded person would disapprove of this kind of procedure.

It must be borne in mind that the regulations in this case specifically gave the plaintiff the right of cross-examination of the government's witnesses. This right was denied him despite his repeated demands that the regulations be complied with in this regard. The Supreme Court recognized and came to grips with this problem in Goldberg v. Kelly, *supra*, when it held:

* * * [A] recipient [of welfare] is not permitted to present evidence * * * or to confront or cross-examine adverse witnesses. *These omissions are fatal to the constitutional adequacy of the procedures.* [Emphasis supplied.] [397 U.S. at 268, 90 S. Ct. at 1021.]

* * * * * *

*In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. E. g.,* ICC v. Louisville & N. R. R. Co., 227 U.S. 88, 93–94, 33 S.Ct. 185, 187–188, 57 L.Ed. 431 (1913); Willner v. Committee on Character & Fitness, 373 U.S. 96, 103–104, 83 S.Ct. 1175, 1180–1181, 10 L.Ed.2d 224 (1963). What we said in Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413, 3 L.Ed. 2d 1377 (1959), is particularly pertinent here:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurors or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment * * *. This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, * * * but also in all types of cases where administrative * * * actions were under scrutiny." [Emphasis supplied.] [at 270, 90 S.Ct. at 1021.]

This is the latest holding by the Supreme Court on this question and, as is seen from the above, is a decision of far-reaching importance in this area.

The case of Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), cited by the Supreme Court was a case where the government was attempting to cancel a security clearance of the plaintiff who was working for a private company on government contracts and was handling classified and secret military information. The government contended he had associations and sympathies with communists. At the hearing, the plaintiff was denied the right of confrontation by his accusers and the right of cross-examination. In fact, he never learned the nature of the evidence against him which the examiners considered in revoking his security clearance. It appeared that the evidence consisted of hearsay reports of inspectors who had made an investigation, but the inspectors did not testify. The Supreme Court held that the plaintiff had the right to be confronted by his accusers and the right to cross-examine them and the denial of these rights was a denial of due process by which his property (his job) was taken from him. In so holding, the court said (in addition to the portion of its opinion quoted above):

> * * * We decide only that in the absence of explicit authorization from either the President or Congress the respondents were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination. [360 U.S. at 508, 79 S.Ct. at 1419–1420.]

It would seem that if a plaintiff in private industry who is alleged to have communist connections, and who has no civil service rights, is entitled to be confronted by his accusers and has the right to cross-examine them, the same rights should be afforded to a loyal government employee with 24 years government service who has civil service rights. This is especially true where, as here, the laws and regulations specifically give him the right of confrontation and cross-examination.

I think the time has come, and is in fact long overdue, for this court to hold that where the regulations of a governmental agency or department provide that an accused employee has the right to be confronted by his accusers and the right to cross-examine the agency's witnesses and he demands these rights at the hearing on his discharge, the government should be required to produce the witnesses, absent a bona fide showing that they are dead, seriously ill, out of the country or otherwise unable to be present for some compelling and justifiable reason, and, if it fails to produce them or fails to make the required showing why they are absent, it should not be allowed to introduce their ex parte hearsay statements into evidence. There is nothing harsh or unreasonable about such a rule. Even if the agency does not have subpoena powers, it could, with a little effort, arrange to have the witnesses present in most cases, and, if its efforts were unsuccessful, it could at least make the required showing why the witnesses were not present. It seems to me that an agency should welcome such a rule. In most cases, it could be complied with easily, and, if its position prevailed at the hearing, which would no doubt be the result in practically all of the cases (judging by those that have come to my attention), its case against the employee would be all the more secure and binding. The employee would have little to complain about if this procedure were to be followed and he was given a fair and meaningful hearing.

## IV

*The Decision was not Supported by Substantial Evidence*

In my opinion, the decision of the examiner against the plaintiff, which be-

came the decision of the Commission, was not supported by substantial evidence. We said in Jacobowitz v. United States, 191 Ct.Cl. ——, 424 F.2d 555 (April 1970):

* * * [I]t is clear that the hearsay evidence of the government was not substantial evidence, regardless of the definition or test that is used. It was uncorroborated hearsay and was objected to by the plaintiff; it was contradicted by direct, legal, and competent evidence at the hearing; and it was not such relevant evidence as a reasonable mind might accept to support a conclusion. [191 Ct.Cl. at ——, 424 F.2d at 562].

The holding in that case could be appropriately applied to this case.

## V

*The Plaintiff was not Given a Fair or Meaningful Hearing*

The Supreme Court said in Goldberg v. Kelly, *supra*:

* * * The hearing must be "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 [85 S.Ct. 1187, 14 L.Ed. 2d 62] (1965). [397 U.S. at 267, 90 S. Ct. at 1020.]

Implicit in this statement is the meaning that the hearing will be held at a proper time and place after notice, and that it will be conducted according to the rules and regulations, with each party having the opportunity to appear in person and by counsel and to present evidence and to question the witnesses of the other party. Above all, it must be a fair hearing for both parties.

In my opinion, there was no such hearing in this case. Actually, there was no hearing at all. The examiner went through a formality which was called a hearing, but it was not held in a "meaningful manner," nor was it fair. As far as the plaintiff was concerned, it was an exercise in futility. The case

was "cut and dried" against him in advance. The rules and regulations were not complied with except when their observance worked against him. The rights and privileges to which he was entitled under the law were denied him.

COLLINS, Judge, joins in the foregoing concurring opinion.